Filed 4/29/13  P. v. Hastings CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>             v.<br><br>KERRY DANA HASTINGS,<br><br>      Defendant and Appellant. | F062135<br><br>(Super. Ct. No. BF129823A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Robert D. Bacon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and A. Kay Lauterbach, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant Kerry D. Hastings fatally shot three men in separate criminal events that occurred in 2006, 2007 and 2009. During this time period he was an active member of the Eastside Crips gang. He was convicted after jury trial of 17 felonies that include three counts of premeditated murder with special circumstances, three counts of premeditated attempted murder, conspiracy to commit murder, robbery, illegal firearm possession and possession of controlled substances with intent to sell. He was sentenced to, inter alia, three terms of life imprisonment without the possibility of parole, to be served consecutively.

In this opinion we hold that appellant's due process rights were not infringed by the loss of a photographic lineup. Also, we reject appellant's challenges to CALJIC No. 8.66.1 and conclude that his objections to admission of testimony that his mother threatened a witness and to portions of the gang expert's testimony do not have any merit. We conclude that count 10 is time barred because criminal proceedings began after expiration of the applicable statute of limitations. The conviction on count 10 will be reversed and the sentence imposed for this count will be vacated. Finally, the superior court will be instructed to correct a clerical error in the abstract of judgment. As so modified, the judgment will be affirmed.

## PROCEDURAL EVENTS

Grand jury proceedings commenced in this case on November 2, 2009. On November 17, 2009, the grand jury returned a true bill on all counts that were contained in the second amended indictment. The second amended indictment was filed on this date.

Counts 1 through 6 in the second amended indictment were alleged to have occurred on March 6, 2004. Appellant was charged in counts 1, 2 and 3 with attempting to murder Columbus Holford, Deon Davis and Keona Roberts with a firearm. Count 4 charged appellant with assault with a machine gun. Count 5 charged him with assault

2.

with a semiautomatic firearm. Count 6 charged him shooting at an occupied motor vehicle. (Pen. Code, §§ 664, 187 subd. (a), 245, subds. (a)(3), (b), 246.)[1]

Counts 7 through 10 were alleged to have occurred on September 20, 2006. Appellant was charged in count 7 with attempting to murder Leon Banks.[2] He was charged in count 8 with assaulting Leon with a semiautomatic firearm and in count 9 with robbing Leon. Count 10 charged him with being a felon in possession of a firearm. (§§ 664, 187, subd. (a), 245, subd. (b), 212.5, subd. (c), former § 12021,[3] subd. (a)(1).)

Counts 11 through 14 were alleged to have occurred on September 21, 2006. Appellant was charged in count 11 with murdering Leon's son, Leonard Banks. He was charged in count 12 with attempting to murder Leon. Count 13 charged appellant with being a felon in possession of a firearm. Count 14 charged him with second degree robbery.[4] (§§ 187, subd. (a), 664, 212.5, subd. (c), former § 12021, subd. (a)(1).)

Count 15 alleged that on September 25, 2006, appellant possessed marijuana for purpose of sale while charges were pending. (Health & Saf. Code, § 11359.)

---

[1] Unless otherwise specified all statutory references are to the Penal Code.

[2] To increase readability some witnesses will be referenced by their first names. Also, a witness's title (e.g., Detective) will be omitted after the initial reference to the witness. No disrespect is intended or implied by these informalities.

[3] The Deadly Weapons Recodification Act of 2010 repealed and recodified former sections 12000 to 12809 without substantive change. (§§ 16000, 16005; Cal. Law Revision Com. com., 51D pt. 2 West's Ann. Pen. Code (2012 ed.) foll. § 16000, p. 317.) Former section 12021, subdivision (a)(1) was repealed by Stats. 2010, ch. 711 (Sen. Bill No. 1080), § 4, operative January 1, 2012. (Historical and Statutory Notes, 51D pt. 1 West's Ann. Pen. Code (2012 ed.) foll. §§ 12010 to 12021.3, p. 48; Historical and Statutory Notes, 51D pt. 1 West's Ann. Pen. Code (2012 ed.) foll. §§ 12316 to 12325, p. 293.)

[4] The second amended indictment alleged that counts 13 and 14 occurred on June 21, 2009. We agree with appellant that this was a clerical error and the People intended to allege that these crimes occurred on September 21, 2006.

Counts 16 through 18 were alleged to have occurred on July 24, 2007. He was charged in count 16 with murdering Ernest Kerr. He was charged in count 17 with attempting to murder Aaron Mosby. Count 18 charged appellant with being a felon in possession of a firearm. (§§ 187, subd. (a), 664, former § 12021, subd. (a)(1).)

Counts 19 through 21 were alleged to have occurred on May 12, 2009. He was charged in count 19 with being a felon in possession of a firearm; in count 20 with carrying an unregistered firearm in public; and in count 21 with carrying a loaded firearm in public. (Former §§ 12021, subd. (a)(1), 12031, subd. (a)(2)(C), (F).)

Counts 22 and 23 were alleged to have occurred on June 30, 2009. Count 22 charged appellant with murdering Anthony Daniels. Count 23 charged appellant with being a felon in possession of a firearm. (§ 187, subd. (a), former § 12021, subd. (a)(1).)

Counts 24 through 27 were alleged to have occurred on July 11, 2009. Counts 24 and 25 charged appellant with being a felon in possession of two different firearms. Count 26 charged him with possession of phencyclidine for purpose of sale. Count 27 charged him with receiving stolen property. (§ 496, subd. (a), former § 12021, subd. (a)(1); Health & Saf. Code, § 11378.5.)

Count 28 charged appellant with participating in a criminal street gang from November 18, 2006 to October 1, 2009. (§ 186.22, subd. (a).)

Count 29 charged appellant with conspiracy to commit murder from September 20, 2006 to October 1, 2009.[5] (§§ 182, subd. (a)(1), 187, subd. (a).)

The murders and attempted murders charged in counts 1, 2, 3, 7, 11, 12, 16, 17 and 22 were alleged to be deliberate and premeditated. Special circumstances of gang

_____

[5] Markisha Williams and Roosevelt Mitchell, Jr. were jointly charged with appellant in count 29. Williams was also jointly charged with appellant in counts 11, 12 and 14. Mitchell died on August 6, 2009. The case against Williams was separately resolved and she was not tried together with appellant.

4.

murder and multiple murders were alleged in connection with counts 11, 16 and 22. (§§ 189, 190.2, subd. (a)(3), (22).)

A section 186.22, subdivision (b)(1)(C) gang enhancement was alleged in connection with every count except count 28.

Several firearm use enhancements were alleged. A section 12022.53, subdivisions (c) and (e)(1) enhancement was alleged in connection with counts 1, 2, 3, 6 and 17. A section 12022.53, subdivisions (d) and (e)(1) enhancement was alleged in connection with counts 7, 9, 11, 12, 14, 16 and 22. A section 12022.5, subdivision (a) enhancement was alleged in connection with counts 4, 5 and 8.

A section 12022.7 enhancement for inflicting great bodily injury was alleged in connection with counts 7 and 8. A section 12022.1 on bail enhancement was alleged in connection with counts 22 through 27. A section 667.5, subdivision (b) prior prison term enhancement was alleged in connection with counts 7 through 28.

On November 19, 2009, appellant pled not guilty and denied the enhancement allegations and special circumstances.

On December 15, 2010, jury trial commenced. Appellant rested on the state of the evidence.

Counts 9, 13, 14, 21, 25, 27 and the prior prison term enhancement allegations were dismissed on the People's motion.

The jury returned its verdicts on February 15, 2011. It found appellant not guilty on counts 1 through 6 and found all of the enhancement allegations attached to these counts not true.[6] It found appellant guilty on all remaining counts (counts 7, 8, 10, 11,

---

[6] The crimes alleged in counts 1 through 6 are based on a shooting that occurred in front of a convenience store named Mr. Fast Gas on March 6, 2004. Since appellant was found not guilty on these counts and did not raise any appellate issues relating to them, a factual summary of the evidence pertaining to this shooting will not be provided.

12, 15, 16, 17, 18, 19, 20, 22, 23, 24, 26, 28, 29) and found all of the enhancement allegations and special circumstance allegations attached to these counts to be true. It found all overt acts attached to counts 29 to be true.

On March 16, 2011, appellant was sentenced to three consecutive terms of life imprisonment without the possibility of parole plus six consecutive terms of 25 years to life imprisonment plus three consecutive terms of seven years to life imprisonment plus a total determinate term of 43 years.

## FACTS

### Events on September 20-21, 2006 (counts 7 to 14)

Leon lived in a single family home on Fairview Drive in Bakersfield with his wife, his son Leonard and their other children. His daughter Shalon's boyfriend, Mike Nettles, lived with them. Leon cultivated marijuana from seed and 12 plants grew in different places inside his fenced backyard. In September 2006, a crop of marijuana was maturing for harvest. Three of the marijuana plants were budding.

Leon testified that after going to bed for the evening on September 20, 2006, he awakened to the sounds of a gunshot and his three beagles barking. He retrieved his gun and went outside. He saw a young Black man climb over his backyard fence and enter a neighbor's yard. The man was holding a piece of a marijuana plant. Leon heard the man talking to another person. Leon climbed onto the fence and told them to leave. He heard the sound of a gunshot and felt a bullet penetrate his right arm. Leon was driven to the hospital where he was treated for a gunshot wound and released about 6:30 a.m.

When Leon returned home, he looked over a side fence and noticed two bags on the ground near the fence. Shalon went into the backyard to check on the dogs. She noticed that one of the marijuana plants was moving rapidly back and forth. One of the dogs repeatedly barked and then looked at her. Shalon concluded someone was in the backyard. She went inside the house and informed Leonard of her suspicions. Leonard picked up a shotgun and walked into the backyard. Leon and Nettles joined Leonard in

the backyard. Nettles looked over the side fence and told Leon that the two bags were still there. Leon sent everyone inside. Leon looked around the area but did not see anyone. He went inside the house.

A short time later, Leon checked the back yard again. He was not armed. Leon noticed that some of the marijuana plants were missing branches and that pieces of marijuana were lying on the ground. Leonard, who was armed with a shotgun, walked onto the back patio. As Leon turned to return to the house, someone started shooting at them. The first two bullets missed Leon but the third bullet hit him in the back and another bullet grazed his shoulder. Leonard fired one round and then a bullet hit him in the torso. Leonard yelled, "[A]h, the [N-word] shot me." Leonard tossed the shotgun to his father and retreated inside the house. Leon saw a heavyset person running through the back yard. Leon could not determine the person's race or gender. Leon reloaded the shotgun and fired one shot at him or her. The shot missed. The person scaled a wobbly fence at the southwest corner of the backyard.

Leon and Leonard were transported to the hospital. Leon survived his injuries but Leonard did not. Leonard died from a single gunshot wound that entered his left side and passed through several internal organs. A 9 mm hollow point bullet was recovered from Leonard's body during the autopsy.

Danielle Jeffers lived next door to the Banks family. Around 11:30 p.m., she heard the sounds of dogs barking and a gunshot. Around 7:00 a.m., she heard gunshots again. She looked out her window towards the Banks' backyard. She saw a man trying to climb the fence from the Banks' backyard into her backyard. The man appeared to be a Hispanic or light skinned Black man who was in his 20's. The man was holding what appeared to be a shotgun with a shortened barrel. He was unable to climb the fence and went back into the Banks' backyard. Then he scaled another fence. While she was on the phone with the emergency operator, Leonard arrived at her house. He had been shot in the chest and was bleeding.

Another neighbor, David Sempel, testified that he heard three pistol shots and then the sound of a shotgun firing as he entered his garage to leave for work at 7:03 a.m. on September 21, 2006. Sempel went outside and saw a man and a woman holding plant material.

Hilda Santiago lived one block south of the Banks family. At 7:00 a.m. on September 21, 2006, she heard a loud explosion. She went outside and walked to her driveway. She saw a chubby Black woman, who was about 20 years old, standing in the front yard of a rental house across the street from Santiago's home. The woman was looking toward the rental house's fenced backyard. About 10 seconds later, a Black male, who was about 19 years old, walked through the gate that separated the front and back yards of the rental house. The woman was about five feet two inches tall; the man was a little taller than the woman.[7] The man wore a gray hooded sweater with the hood up. Santiago did not get a good look at the man's face and would not be able to recognize him if she saw him again. The man was carrying a bundle of plant material. He joined the woman and they walked away in an easterly direction.

Investigators found blood on the Banks' back fence and a trash can that was subsequently determined to be consistent with the DNA profile of Diante Nettles. Three bags containing marijuana plant material were found in adjoining backyards. There was a trail of marijuana plant material on neighborhood sidewalks.

Shanika Herron testified that she dated appellant during 2006 and 2007.[8] She heard appellant say that Julia Johnson told him where to find the marijuana.

---

[7] The probation report states that appellant is five feet inches tall and weighs 150 pounds. He was 21 years old in September of 2006.

[8] Herron testified under a grant of immunity and received financial assistance from the witness relocation program.

**Events on September 25, 2006 (count 15)**

On September 25, 2006, a traffic stop was effected of a vehicle appellant was driving. The vehicle belonged to his mother, Theresa Ellis. Appellant was arrested for driving without a valid license. (Veh. Code, § 12500.) The officer discovered that appellant was on parole and conducted a search of his person. The officer found two cell phones, over $216 in cash and plastic baggies.

The officer obtained consent to search Ellis's residence. A backpack was found underneath a bag containing a man's dirty laundry. Unprocessed marijuana that was in bud form and still attached to the branch on which it had been growing was found inside the backpack. Ellis testified that appellant brought his laundry to her apartment.[9]

A DNA analysis was conducted on samples of the marijuana that was found in the backpack. The marijuana had five different genotypes; four of these genotypes matched the genotypes of the marijuana growing in the Banks' backyard.

**Events on July 24, 2007 (counts 16 to 18)**

On July 24, 2007, Ernest Kerr, Aaron Mosby and Clarence West were conversing on the sidewalk outside the gated Cottonwoods Apartments complex located on Cottonwood and Cheatham Avenues in Bakersfield. This location is claimed by the Country Boy Crips gang. West was dressed in red clothing. Mosby testified that he thought West's choice of attire was "not too smart" because red is a gang-related color that should not be worn in this neighborhood. West, Mosby and Kerr were not gang members.

A Dodge Magnum with tinted windows repeatedly drove past them. Suddenly two young, slim Black men ran towards West, Kerr and Mosby from inside the apartment building. One of the men fired a rifle at them. Kerr was struck by three bullets. Mosby

---

[9] When the marijuana was discovered, Ellis told the police that she did not know whose marijuana it was. At trial, she testified that it belonged to Jimmy Rufus.

ducked behind a car. West fled, pleading, "Please don't shoot me." The three men chased West. West flagged down a passing police car and got inside it. Neither Mosby nor West was able to identify the men who shot at them.

Kerr died from the gunshot wounds. The pathologist testified that Kerr was probably lying on the ground when the fatal bullet struck his abdomen. Three .223-caliber bullets were removed from Kerr's body.

Six .223-caliber shell casings were found at the crime scene. This type of ammunition is most commonly used in "rifle similar to … a military M-16 or an AR-15."

Pearlene Cannon told a police officer that she saw appellant and two other men run shortly after hearing the sound of gunshots. Appellant was carrying a "machine gun." She said to him, "Kerry." Appellant stopped and looked at her. The three men looked at each other for a moment and then appellant began running again. They ran into a nearby apartment building where appellant lived with his girlfriend.

Shanika Herron testified that she lived in an apartment that was located south of the apartment complex where the shooting occurred. For about a month around the time of the shooting, appellant stored a long "Army gun" at her apartment. Typically, appellant would call Herron before he came over. She would wrap herself and the gun in a blanket and bring it outside to him. On July 24, 2007, appellant called Herron and told her he was coming over for his gun. She brought it to him in the usual way. Herron saw appellant get into a Dodge Magnum. Herron saw Anthony Hodge sitting in the car. A few minutes later, Herron was outside checking her mail when she heard the sound of gunshots at the apartment complex north of the one where she lived. Then she saw appellant running towards her. He was carrying his gun. Appellant headed towards a parking lot where the Dodge Magnum was parked. Five minutes later, appellant telephoned her. He told her "[t]o go outside and see how many people he hit."

**Events on May 12, 2009 (counts 19 to 21)**

On May 12, 2009, a search warrant was served in an apartment located on Northrup Street in Bakersfield where appellant lived with Ebony Nichols. Appellant was standing in the bedroom where officers found a set of car keys underneath a pile of clothes. The keys fit a Buick that was parked in front of the building. A .22-semiautomatic handgun loaded with 10 live rounds in the magazine was found inside the Buick's front center console. Examination of the firearm yielded DNA that was subsequently determined to be consistent with appellant's DNA profile. Appellant's grandmother, Annie Ellis, told a police officer that appellant had just returned after driving his children in the Buick to a bus stop.[10] Appellant posted bail on May 30, 2009.

**Events on June 30, 2009 (counts 22 and 23)**

Shortly after midnight on June 30, 2009, Anthony Daniels was standing in front of a house on Reese Street in Bakersfield socializing with Eddie Earl Howard, Kelan Williams and another man. Krystal San Nicholas, Christina Shepherd and some other people also were outside chatting with each other. This location is claimed by the Country Boy Crips. Daniels approached Nicholas and Shepherd. He chided them for failing to pay attention to their surroundings and asked them if they saw the people "walking up." Nicholas looked around and saw three Black men walking towards them. Nicholas heard Daniels ask the men, "[W]ho are you[?]" One of the men answered, "S's." "S" is an abbreviation for "Southside," which refers to the Country Boy Crips. The men started shooting. Shepherd testified that they were shooting at Daniels. Howard and Williams were armed and they returned fire. The three men ran away in the direction from which they came. One of them soon slowed down and began limping. After the police left the crime scene, Nicholas told Shepherd that "K9" shot Daniels. Shepherd

---

[10]At trial, Annie testified that appellant drove a white Impala that morning.

11.

knew that "K9" referred to appellant because she was friends with one of appellant's sisters.[11]

Daniels suffered multiple gunshot wounds and was transported to a hospital. Appellant arrived at the same hospital a few minutes later. He had sustained a gunshot wound in the left buttock and the bullet was lodged in his left hip. Daniels and appellant were placed in nearby rooms in the emergency ward. Daniels died a short time later. Daniels mother became hysterical. When she informed people who had gathered in the waiting area of Daniels' death, they created a loud disturbance. At the same time, appellant left the hospital against medical advice, claiming that he was "not getting any respect."

Appellant had arrived at the hospital in a silver colored SUV. The SUV belonged to Regan Roberts, who was Roosevelt Mitchell, Jr.'s girlfriend. Mitchell had borrowed the SUV earlier that evening, telling Roberts that he was going to drive it to Los Angeles. Roberts received a telephone call between 2:00 a.m. and 3:00 a.m. informing her that the car was parked in her driveway. The SUV was impounded by the police on the day after the shooting. Several small blood stains were found on the vehicle's back seat.

Seven .45-caliber shell casings, two .45-caliber bullets and one .22-caliber bullet were located at the crime scene. Two .22-caliber bullets, a .38- or .357-caliber bullet and a .45-caliber bullet were removed from Daniels' body.

Bakersfield Police Officer Ryan Kroeker testified that Nicholas told him that she recognized appellant as one of the men who shot Daniels. Nicholas said she recognized appellant because they previously attended school together.

---

[11] Shepherd provided this information to the police after her boyfriend was killed in September of 2009. She was placed into the witness protection program. Nicholas was on a material witness hold when she testified.

12.

Kern County Sheriff's Detective Jason Balasis testified that Nicholas told him that appellant and Mitchell were two of the men who shot at Daniels.

Herron recalled seeing appellant on crutches in July 2009. Appellant told her that he "did something" on Reese Street and shot himself in the foot.

**Events on July 11, 2009 (counts 24 to 27)**

Appellant was arrested in a motel room on July 11, 2009. He had phencyclidine on his person and appeared to be under the influence of this drug. Additional PCP, a .45-caliber pistol, a .380-caliber pistol, a box of sandwich baggies, rolling papers and two pairs of Nike brand shoes were found in the motel room. The .45-caliber pistol matched one of the spent shell casings found at the Reese Street crime scene. The size and class characteristics of the Nike shoes matched some of the shoe tracks that investigators found on the dirt path by the canal bank at the Reese Street crime scene.

**Testimony of Jason Dawson**

Jason Dawson testified that he was an Eastside Crips member for 20 years.[12] Dawson and appellant were close friends. He knew appellant to be a fellow Eastside Crips gang member. Appellant belonged to the Lakeview Gangstas subset. Dawson explained that there was an ongoing conflict between the Country Boys and the Westside Crips together against the Eastside Crips. The hatred among the Eastside Crips towards the Country Boys was particularly intense during the period of time from February through July of 2009. Dawson testified that he saw appellant daily during this time period He witnessed appellant selling crack cocaine and PCP. Appellant was using a crutch and was armed with a .45-caliber pistol the last time Dawson saw him. Dawson knew that appellant had been shot and asked him if he was all right. Appellant replied, "I toot my shit." This phrase is gang parlance meaning, "I killed someone."

---

[12] In exchange for Dawson's testimony, the People dismissed felony charges that were pending against him.

13.

Dawson was arrested on July 14, 2009. He encountered appellant in jail and they shared a cell for a few days. During this period, appellant talked to Dawson about the murders. Dawson testified that appellant said that he and some other people went to the Banks' house on two occasions to steal marijuana. Appellant said that Leon "had got shot the first time, and that [there was] so much marijuana there that they had to go back and get it." Appellant said that Henry Cartwright's girlfriend gave him a .9 mm firearm and he used this weapon to shoot Leonard.

With respect to the Kerr murder, Dawson testified that appellant said that he was told that there were some Country Boys loitering in front of the Cottonwood apartment complex. He had his girlfriend bring him the assault rifle. Then he "and Eugene Cook snuck through the apartments up on the guys and opened fire."

With respect to Daniels' murder, appellant said that Mitchell and "G-Bob," who are also Eastside Crips members, accompanied him. Appellant told Dawson that they walked down the canal and snuck up a dirt alley. As they approached Daniels and his companions, they called out "South" and "S's" to make the intended victims think that they were friends. They used a .22-caliber gun, a .45-caliber gun and a .357-caliber gun. Appellant said that "[a]s they were fleeing, someone was shooting back and shot him in the butt." Appellant said that "Nuke" took him to the hospital. He was placed in a room next to the person he just shot. The victim's family and some Country Boy Crips were at the hospital. Appellant left without being treated because he did not feel safe. Appellant said that he wore a royal blue shirt and sneakers during the attack.[13] Dawson testified that appellant's act of killing a rival gang member increased his respect within the Eastside Crips and that it is taboo to take credit for a murder you did not commit.

---

[13] Nicholas told a police officer that one of the men who shot at Daniels wore a royal blue shirt. The color royal blue is associated with the Eastside Crips.

Dawson called a police officer and offered to provide information in exchange for concessions in his pending case. On August 9, 2009, Dawson and appellant were housed together in a cell that was equipped with a recording device. Later that day and on the following day appellant made incriminating statements to Dawson during their conversations. The conversations were recorded and the recordings were played for the jury.

During these conversations, appellant told Dawson that Mitchell, Diante Nettles, Jesse Hill and "Don Don" accompanied him on the first trip to the Banks' house. Appellant brought a backpack and a duffel bag to hold the marijuana that they intended to steal. Appellant said that they were in the backyard pulling up the marijuana plants when "someone had came and seen them, and they had all ran. And Mr. Banks had grabbed another guy at the fence and was holding him and that he reached over the guy and shot him" with a .22-caliber gun. On the second trip to the Banks' house, appellant took "Julia" as the driver and "Markisha" as the look-out. While he was in the backyard Markisha alerted him that someone was coming. Appellant saw two people enter the backyard from the house. He crouched down in a shooting stance and began firing at them. Appellant said that he killed Leonard.

Appellant told Dawson that during the attack on Kerr and Mosby he shot "this boy," who fell on the ground. Then "a gay dude" started screaming and he told Cook to shoot him. Appellant said that after the shooting they got into a Dodge Magnum and drove away. Appellant did not know who he killed until he heard it on the news the following day. He was disappointed that he had not killed a rival gang member.

Appellant told Dawson that during the attack on Daniels he was armed with the .45-caliber gun. Mitchell and G-Bob were armed with a .357-caliber gun and a 22-caliber gun. Appellant said that he fired exclusively at Daniels, who was trying to turn and run when he shot him multiple times.

15.

**Expert gang testimony**

Bakersfield Police Officer Brent Stratton testified as a gang expert. He opined that appellant was an active member of the Eastside Crips gang when each of the charged offenses was committed. With respect to each offense, Stratton testified in response to a hypothetical that the crime was committed for the benefit of, at the direction of, or in association with the Eastside Crips with the intent to promote, further, or assist in criminal conduct by gang members.[14]

## DISCUSSION

### I. Appellant's Due Process Rights Were Not Infringed By Loss Of A Photographic Lineup.

#### A. Facts.

Santiago testified that on the morning of September 21, 2006, she saw a chubby Black woman, who was about 20 years old, standing in the front yard of a rental house across the street from her home. About 10 seconds later, a Black male, who was about 19 years old, walked through the gate that separated the front and back yards of the rental house. The man wore a gray hooded sweater with the hood up. Santiago did not get a good look at the man's face and would not be able to recognize him if she saw him again. The man was carrying a bundle of plant material. He joined the woman and they walked away in an easterly direction. Santiago also testified that about a week later two police officers came to her home. One of the officers spoke Spanish. The officers showed her a lineup of six Black males. Santiago was not "able to identify any of the pictures as the person [she] saw."

---

[14] Stratton's testimony will be discussed in greater detail during the discussion of appellant's challenges to admission of the expert gang evidence.

The People called Bakersfield Police Detective Anthony Mosley. Mosley testified he recalled speaking with Santiago after Leonard's murder. Mosley had not remembered this conversation until the day he testified.

At this point, defense counsel objected; Mosley and the jury were excused. Defense counsel asserted that the prosecutor's failure to disclose the photographic lineup that was shown to Santiago during discovery was a *Brady* violation. (*Brady v. Maryland,* (1963) 373 U.S. 83.) The prosecutor and defense counsel were unaware that Santiago had been shown a photographic lineup. During Santiago's grand jury testimony she had not testified that she was shown a lineup. Defense counsel stated that he would have presented a different opening statement, conducted a different voir dire examination and retained an identification expert if he had been informed during discovery that Santiago was shown a lineup.

An evidentiary hearing was conducted. (Evid. Code, § 402.) During this hearing, Mosley testified that he did not recall showing Santiago a lineup until a police officer mentioned to him that Santiago had testified about it. Mosley had not told the prosecutor that he spoke with Santiago or showed her a lineup because he did not remember these events. Mosley now recalled creating a standard six person photographic lineup and showing it to Santiago about five to seven days after Leonard was killed. Appellant's photograph was included in the lineup because he was a person of interest at that time. Santiago did not select anyone from the lineup. A detective who spoke Spanish acted as a translator because Santiago did not speak English. Mosley did not have Santiago sign the lineup or indicate in any way that she had looked at it. Mosley did not prepare a police report documenting this part of the investigation. He did not book the lineup into evidence.

Mosley had unsuccessfully attempted to obtain a copy of the lineup. He examined the "murder book," which is a binder containing all of the original information on the homicide, but it did not contain a copy of the lineup. Mosley telephoned the caretaker of

17.

records, who informed him that the computer system had been replaced and the photographic lineup could not be recovered. Appellant's two booking photos that were taken in 2006 were preserved in the computer system.

Bakersfield Police Detective Herman Caldas testified during the evidentiary hearing that he accompanied Mosley to Santiago's house and acted as a translator because Santiago only spoke Spanish. Santiago was shown a photographic lineup that consisted of six Black males. Santiago said that she was unable to identify anyone in the lineup because the person that she saw was moving "too fast." Santiago did not "say anything to the effect of the man that I saw across the street is not in this lineup."

Stratton testified during the evidentiary hearing that he attempted to locate the photographic lineup that was shown to Santiago. The lineup was preserved for about two years and three months in the Picture Link computer program. The Picture Link system was replaced with the Cogent program on January 1, 2009. At that time, the lineup was irretrievably lost. Stratton contacted the administrator for the Picture Link program for Kern County, who confirmed that the program "is now defunct." The administrator told him that booking photos, but not photographic lineups, were transferred to the Cogent program because lineups required too much space on the server. Stratton contacted the company that created and owns the Picture Link program. He was told that the company does not have any way of preserving lineups; a lineup would have to be maintained on a local server.

Defense counsel argued that the lineup "was obviously exculpatory material" in the police's custody and they had a duty to preserve it. Defense counsel stated he was not alleging bad faith on the part of prosecution or law enforcement. He motioned for dismissal of all counts related to Leonard's murder and mistrial as to all other counts.

The prosecutor stated that she "would agree … that the police officer did not act in bad faith. I don't think he purposefully destroyed the lineup. I think he felt that it was

not a requirement of his office to book lineup in which someone is not identified and acted negligently in not preserving it."

The trial court denied the motions for dismissal and a mistrial. It found the loss of the lineup did not violate appellant's due process rights and justice had not been obstructed. It found that the exculpatory value of the lineup was not readily apparent when Detective Mosley showed it to Santiago. Appellant was not a suspect at that time; he was only a person of interest. Also, Santiago did not tell Detective Mosley that appellant was not the person she saw. She merely said that she could not identify anyone in the lineup. The court also found that the same evidence could be obtained by other reasonably available means. The booking photo of appellant that was used in the lineup is still available (exhibit No. 38) and could be shown to the jury. Detective Mosley could testify that he used this photo in the lineup and Santiago did not select anyone from the lineup. Also, "the defense has conceded that there is no evidence of bad faith by either law enforcement or the prosecutor in this case." The court reserved appellant's right to seek remedy or sanctions for late discovery.

When the trial resumed, Mosley testified that five to seven days after Leonard's death he showed Santiago a photographic lineup containing appellant's photograph. The photograph of appellant that was used in the lineup was the booking photograph that was marked as People's exhibit No. 38. This photograph was taken about three weeks before Leonard was killed. Santiago did not recognize anyone depicted in the lineup. Mosley testified that he did not save the lineup, did not book it into evidence and did not write a police report about his contact with Santiago. Mosley left the homicide department in late 2006 or early 2007. He did not tell the prosecutor about his contact with Santiago.

The court instructed on the discovery violation with CALJIC No. 2.28, as follows:

> "The prosecution and the defense are required to disclose to each other before trial the evidence each intends to present at trial so as to promote the ascertainment of the truth, save court time, and avoid any surprise which may arise during the course of the trial. Delay in the

19.

disclosure of evidence may deny a party a sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the noncomplying party's evidence.

"Disclosures of evidence are required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately.

"In this case, the People failed to timely disclose the following evidence: The existence of the photographic lineup produced to Hilda Santiago by Detective Mosley shortly after the incidents alleged [in the Banks' murder] and her failure to identify any persons in the lineup. [¶]…[¶]

"Although the People's failure to timely disclose evidence was without lawful justification, the Court has, under the law, permitted the production of this evidence during the trial.

"If you find that the delayed disclosure was by the prosecution and relates to a fact of importance rather than something trivial and does not relate to subject matter already established by other credible evidence, you may consider that delayed disclosure in determining the weight to be given to that particular evidence."

## B. Failure to preserve the lineup was not a due process violation because there was no bad faith, the lineup did not possess apparent exculpatory value when it was lost, and comparable evidence was elicited at trial by alternative means.

Appellant contends that loss of the lineup prejudicially infringed his due process rights (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, §§ 7, subd. (a), 15) because this evidence was exculpatory and material. We are not convinced. As we will explain, the lineup did not have exculpatory value that was apparent at the time it was lost and comparable evidence was reasonably available at trial by other means. There was no bad faith on the part of the police or the prosecutor. Therefore, the failure to timely disclose the lineup to the defense did not infringe appellant's due process rights. The cautionary instruction given by the court was an appropriate remedy for the discovery violation.

The United States Supreme Court has held that law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve "evidence

20.

that might be expected to play a significant role in the suspect's defense." (*California v. Trombetta* (1984) 467 U.S. 479, 488, fn. omitted (*Trombetta*).) To fall within the scope of this duty, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Id*. at p. 489.) If a defendant demonstrates either that significant exculpatory evidence was lost or establishes bad faith in connection with the loss of potentially useful evidence, then a due process violation has occurred and the trial court has discretion to impose appropriate sanctions. (*People v. Medina* (1990) 51 Cal.3d 870, 894.) "[U]nless a criminal defendant can show bad faith on the part of the police [or the prosecution], failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Arizona v. Youngblood* (1988) 488 U.S. 51, 58.)

In *People v. Velasco* (2011) 194 Cal.App.4th 1258, the Sixth Appellate District discussed the applicable standard of review, writing:

> "… It is settled that the substantial evidence standard applies to a trial court's determination, following a factual inquiry, that the state acted in good or bad faith in failing to preserve evidence. [Citation.] Beyond that, the matter seems to be unresolved nationwide. (Compare *State v. Leonard* (2005) 217 W.Va. 603, 609-610 [619 S.E.2d 116, 122-123] [clearly erroneous standard of review applies to trial court's factual findings after it conducts an evidentiary hearing on a *Trombetta* motion (see *State v. Osakalumi* (1995) 194 W.Va. 758 [461 S.E.2d 504])] with *U.S. v. Cooper* (9th Cir. 1993) 983 F.2d 928, 930, 931 [applying de novo standard of review although a factual inquiry took place] and *State v. Burden* (2001) 104 Wn.App. 507, 512 [17 P.3d 1211, 1214] [applying de novo standard of review, but it is unclear whether a factual inquiry took place].)" (*People v. Velasco, supra,* 194 Cal.App.4th at p. 1262.)

The *Velasco* court concluded that it "need not resolve this threshold consideration here, however, because under any standard of review defendant's *Trombetta* claim fails." (*People v. Velasco, supra*, 194 Cal.Appp.4th at p. 1262.) Similarly, in this case appellant's *Trombetta* argument fails under any standard of review.

21.

"To meet [the] standard of constitutional materiality, [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta, supra*, 467 U.S. at p. 489.) "'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.' [Citation.]" (*People v. Fauber* (1992) 2 Cal.4th 792, 829.) Evidence with only "minimal exculpatory value" does not meet the constitutional standard of materiality. (*People v. Beeler* (1995) 9 Cal.4th 953, 977.) For example, in *Kordenbrock v. Scroggy* (1990) 919 F.2d 1091, the defendant claimed a victim's identification of him as the perpetrator in a later photo lineup was influenced by the overly suggestive nature of an earlier unsuccessful photo lineup that the police failed to preserve. The Court of Appeals, Sixth Circuit, rejected this argument, reasoning that the lineup was not material exculpatory evidence: "Kordenbrock has never denied that [the victim's] identification is correct, and any error in the photo display, if one had occurred, would be harmless beyond a reasonable doubt…. [¶] The fact that the photo display was lost does not help Kordenbrock's case. The misplacement or destruction of the display does not entitle Kordenbrock to a presumption that a constitutional violation has occurred. Under the *Trombetta* test, the display would have not had any exculpatory value." (*Id*. at p. 1103.)

Our Supreme Court considered the effect of failing to preserve a color copy of a photographic lineup in *People v. Yeoman* (2003) 31 Cal.4th 93. Yeoman robbed and attempted to kidnap Geraldine Ford. Ford failed to identify Yeoman in the first photographic lineup that was shown to her but subsequently identified him in a later photographic lineup. (*Id*. at pp. 108, 126.) The police lost the original color photographs that were used in the first photographic lineup. A black and white photocopy of this lineup was available and introduced at trial. The trial court refused to exclude Ford's

22.

identification testimony. The Supreme Court upheld this ruling, reasoning: "Despite the loss of the original photographs, the defense successfully proved with the photocopy and through the testimony of Detective Trimble that Ford had failed to identify defendant on February 17. The court's remedial rulings barred the People from attempting to rebut the defense evidence by arguing that the original photograph was not a good likeness of defendant. On this record, we see no reason to doubt that defendant received a fair trial." (*Id* at p. 126.) It then concluded that Yeoman did not suffer any prejudice, even if the "hypothetical error" is evaluated under the stringent *Chapman* standard, because the evidence identifying Yeoman as Ford's attacker was so strong it left no serious doubt that the defendant was Ford's assailant. (*Id*. at pp. 126-127.)

Appellate courts in several states other than California have rejected due process claims arising from the police's failure to preserve a photographic lineup in which the witness did not select the defendant's photograph. While not binding on this court, these decisions may be considered "for their cogent reasoning and persuasive value." (*McCann v. Lucky Money, Inc*. (2005) 129 Cal.App.4th 1382, 1396.) *Maresca v. State* (Nev. 1987) 748 P.2d 3, determined that the exculpatory value of the lineup was not apparent and no prejudice occurred because the jury saw the picture of the defendant that was used in the lineup and heard testimony that the witness was not able to identify the defendant from the lineup. (*Id*. at p. 5.) *Cuesta v. State* (Tex.Ct.App. 1988) 763 S.W.2d 547, concluded that the failure to disclose an unsuccessful lineup did not have any effect on the outcome of the trial because defense counsel cross-examined the victim and the investigating detective about the victim's failure to identify the defendant from the photo lineup. (*Id*. at p. 554.) *People v. Ramirez* (N.Y. 1996) 224 A.D.2d 455, reasoned that "the defendant failed to adequately show how the photo array, which was destroyed by the arresting officer, would constitute exculpatory material. The exculpatory value that would have been derived from the photo array would be no more than the complainant's

failure to identify the defendant, an issue that was fully explored by the defense counsel in his cross-examination of the arresting officer." (*Id.* at p. 456.)

Having reviewed the applicable legal principles and decisions we now turn to an assessment of the factual circumstances before us. Appellant contends that the destroyed photographic lineup constitutes material exculpatory evidence. We disagree. The photographic lineup was merely potentially useful evidence. Santiago testified that she did not get a good look at the face of the man she saw on the morning of September 21, 2006. Santiago was across the street from the man and saw him only briefly. The man was wearing a sweater with the hood pulled up over the top of his head. Santiago was not able to describe any of the man's facial features. She testified that she would be unable to recognize this male if she saw him again. Santiago's inability to select anyone from the lineup merely corroborated her testimony that she did not get a good look at the male's face and would be unable to identify him if she saw him again. It did not tend to prove that appellant was not present at the Banks' house on the morning of September 21, 2006.

Appellant's contention that there was no substitute means for the defense to present this evidence is also unconvincing. The jury learned through testimony provided by Santiago and Mosley that she was shown a photographic lineup about a week after the shooting that included appellant's photo and that she did not select anyone from this lineup. The jury was shown the photograph of appellant that Mosley used in the lineup. The jury knew Santiago's location, vantage point, the time of day, the lighting and the amount of time she had to make her observations. The lineup did not have any additional evidentiary value beyond Santiago's failure to identify appellant and that point was fully explored during direct and cross-examination of Santiago and Mosley.

Finally, there was no evidence of bad faith on the part of the police or the prosecutor. Undisputed testimony proved that the lineup was lost during a change in computer systems. It was not destroyed to prevent appellant from benefitting from any

24.

value it might have. When the photographic lineup was shown to Santiago, appellant was merely a person of interest. Mosley did not remember speaking with Santiago or showing her the lineup before Santiago testified at trial. Santiago had not mentioned being shown a lineup during her testimony before the grand jury.

Accordingly, we conclude that because the lineup was merely potentially useful evidence and neither the police nor the prosecutor acted with bad faith, appellant's due process rights were not infringed by the failure to preserve the lineup and disclose it to the defense in a timely manner.

We turn to the question whether the trial court fashioned an adequate remedy for the discovery violation. "[T]he courts enjoy a large measure of discretion in determining the appropriate sanction that should be imposed because of the destruction of discoverable records and evidence." (*People v. Zamora* (1980) 28 Cal.3d 88, 99.) Permissible sanctions include fashioning a suitable cautionary instruction. (*Id.* at pp. 102-103.) In this case, the court gave a modified version of CALJIC No. 2.28. This instruction informed the jury that the prosecution failed to timely disclose the photographic lineup to the defense and that it could consider the delay in determining the weight to be given to that particular evidence. Considering all the circumstances, we find this cautionary instruction to be an adequate remedy for the discovery violation.

## II. CALJIC No. 8.66.1 Is Not Unnecessary, Argumentative Or Biased.

### A. Facts.

Appellant was charged with six counts of attempted murder. He was charged in counts 1, 2 and 3 with attempting to murder Holford, Davis and Roberts. Count 7 charged him with attempting to murder Leon on September 20, 2006, and count 12 charged him with attempting to murder Leon on September 21, 2006. Count 17 charged him with attempting to murder Mosby. Appellant was found guilty of twice attempting to murder Leon and attempting to murder Mosby. He was found not guilty of attempting to murder Holford, Davis and Roberts.

25.

The prosecutor relied on a "kill zone" theory of concurrent intent in two of the attempted murder counts: the second attempt on Leon's life and the attempt to kill Mosby. The facts of these crimes will be briefly recapitulated.

Appellant attempted to kill Leon twice. The first attempt on Leon's life occurred late at night on September 20, 2006. When Leon attempted to stop appellant and others from stealing his marijuana plants, Leon was shot in the arm. The second attempt on Leon's life occurred a few hours later. Appellant returned to Leon's backyard to steal more marijuana. When Leon and Leonard walked outside into the yard, appellant shot at them. Both men were hit; Leon survived but Leonard did not.

Appellant attempted to murder Mosby on July 24, 2007. On that evening, Mosby was standing outside an apartment complex, conversing with Kerr and some other people. Suddenly, appellant and two other men ran towards them. Appellant fired a semiautomatic rifle at them. Kerr was struck by a bullet and killed. Mosby was not injured.

The court instructed on the elements of attempted murder with CALJIC No. 8.66. It instructed on the concept of concurrent intent with CALJIC No. 8.66.1. Appellant did not object to either of these instructions. CALJIC No. 8.66.1 provided:

> "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. This zone of risk is termed the 'kill zone.' The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity.
>
> "Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a 'kill zone' zone of risk is an issue to be decided by you."

The prosecutor argued in closing that the "kill zone" theory applied to the second attempt to kill Leon and the attempt to kill Mosby. He said:

"[Y]ou can be the victim of attempted murder or the unintended victim, but if you are within that kill zone, you intend to kill everyone within that zone. [¶] Let's talk about the Cottonwood case for an example. Ernest Kerr, Clarence West, and Aaron Mosby were all in a group there, and the defendant walked up and opened fire on all of them. He intended to kill them all because they were within the kill zone. They were within a short group and -- or a small group, gathering of people. [¶] The same could be true for the kill zone of some of the others on Reese Street, but actually no attempted murders are charged for anybody there. [¶] And, also, the same is true with Mr. Banks and -- Leonard Banks for that second incident, that Mr. Banks -- when Leonard was killed within the kill zone."

Later, the prosecutor argued:

"As far as the attempted murders that are alleged in connection with the Cottonwood crime, there is one attempted murder charge where Aaron Mosby is the victim. The defendant is guilty of this crime, too, because he intended to kill all of those in the kill zone, the danger zone. [¶] He came out of that gate firing at a group of people that were very, very close together. Mosby was forced to run and hide. Luckily, he was not shot. The defendant is still guilty of the attempted murder of Aaron Mosby because he was in that area."

**B.      The jury was properly instructed on concurrent intent.**

Appellant contends that inclusion of CALJIC No. 8.66.1 in the jury charge violated his federal constitutional rights (U.S. Const., 5th, 6th & 14th Amends.) because the instruction was "argumentative, biased and unnecessary." We disagree.

**1.      Forfeiture**

The Attorney General argues this challenge to CALJIC No. 8.66.1 was forfeited because appellant did not object to this instruction on any ground at trial. We agree. *People v. Campos* (2007) 156 Cal.App.4th 1228 (*Campos*) found that a challenge to the clarity and completeness of CALCRIM No. 600, which is another pattern instruction on concurrent intent, was forfeited by the absence of contemporaneous objection. (*Id.* at p. 1236.) It reasoned: "Generally, '"[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."'

[Citations.]" (*Ibid.*)  We discern no basis to depart from *Campos* on this point.  In any event, appellant's challenges to CALJIC No. 8.66.1 are not persuasive.

### 2. Legal principles related to concurrent intent/kill zone.

"""""The mental state required for attempted murder has long differed from that required for murder itself.  Murder does not require the intent to kill.  Implied malice—a conscious disregard for life—suffices.  [Citations.]  In contrast, "[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." [Citations.]' [Citation.]" (*People v. McCloud* (2012) 211 Cal.App.4th 788, 796-797 (*McCloud*).)  Transferred intent can support murder convictions if nontargeted individuals are killed but it cannot support attempted murder convictions concerning nontargeted person who survive.  (*Id*. at p. 797.)

The kill zone theory, first considered by our Supreme Court in *People v. Bland* (2002) 28 Cal.4th 313 (*Bland*), "yields a way in which a defendant can be guilty of the attempted murder of victims who were not the defendant's 'primary target.'  [Citation.]" (*McCloud, supra,* 211 Cal.App.4th at p. 797.)  *Bland* "explained … that if a person targets one particular person, under some facts a jury could find the person *also*, concurrently, intended to kill—and thus was guilty of the attempted murder of—other, nontargeted persons." (*People v. Stone* (2009) 46 Cal.4th 131, 137 (*Stone*).)  Citing *Ford v. State* (1993) 330 Md. 682 [625 A.2d 984], *Bland* "recognizes that a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim.  Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm." (*People v. Smith* (2005) 37 Cal.4th 733, 745-746 (*Smith*).)  Examples where the kill zone theory apply

28.

include "using an explosive device with intent to kill everyone in the area of a blast, or spraying a crowd with automatic weapon fire, a means likewise calculated to kill everyone fired upon." (*People v. Perez* (2010) 50 Cal.4th 222, 232 (*Perez*).)

*Bland* cited with approval this court's decision in *People v. Vang* (2001) 87 Cal.App.4th 554. (*Bland, supra*, 28 Cal.4th at p. 330.) In *Vang*, the defendants used "high-powered, wall-piercing weapons" to spray bullets into an occupied duplex unit and an apartment. We found that the evidence supported the conclusion that the "defendants harbored a specific intent to kill every living being within the residence they shot up." (*Vang, supra,* at p. 564.)

Subsequent decisions by our Supreme Court have explored the boundaries of the kill zone theory. *Stone, supra*, 46 Cal.4th 131, held that the mental state required for attempted murder is the intent to kill a human being, not a particular human being. "Although a primary target often exists and can be identified, one is not required." (*Id*. at p. 140.) It decided that the kill zone theory did not fit the charge or facts of the case and, therefore, the trial court erred by instruction on the point. Most recently, *Perez, supra,* 50 Cal.4th 222, held that the defendant did not create a kill zone by firing a single shot into a group of people. (*Id*. at pp. 231-233; see also *Smith, supra,* 37 Cal.4th 733.)

### 3. Instruction on concurrent intent is discretionary.

"""The trial court has the duty to instruct on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.' [Citation.]""" (*McCloud, supra,* 211 Cal.App.4th at p. 796.)

Appellant does not argue the People produced insufficient evidence to justify instruction on concurrent intent. Rather, he argues that the instruction is "unnecessary" and should never be used. In support, appellant relies on the following passage in the *Bland* decision: "This concurrent intent theory is not a legal doctrine *requiring* special

29.

jury instructions, as is the doctrine of transferred intent. Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Bland, supra*, 28 Cal.4th at p. 331, fn. 6, italics added.) The fallacy in appellant's argument is readily apparent. Appellant incorrectly equates not required with unnecessary. These terms are not synonymous. This passage is not properly understood as prohibiting separate instruction on concurrent intent. Rather, it makes instruction on this point discretionary.

As we have explained, in the years following the *Brand* decision the Supreme Court decided three cases involving the kill zone theory: *Stone, supra*, 46 Cal.4th 131, *Smith, supra*, 37 Cal.4th 733 and *Perez, supra*, 50 Cal.4th 222. In none of these cases did the Supreme Court affirmatively decide that separate instruction on concurrent intent should not be given even when the People have produced substantial evidence in support of the kill zone theory. *Smith, supra*, 37 Cal.4th 733, parenthetically noted that *Bland* does not "require the giving of … special instructions." (*Id*. at p. 746.) In *Stone*, the Supreme Court quoted the portion of *Bland* on which appellant relies and then wrote: "Nevertheless, current pattern jury instructions discuss the kill zone theory. (CALJIC No. 8.66.1 (2004 rev.); CALCRIM No. 600 (2008).) The Bench Notes to CALCRIM No. 600 explain that *Bland* stated that a special instruction on the point is not required, and that the kill zone 'language is provided for the court to use in its discretion.'" (*Stone, supra*, 46 Cal.4th at pp. 137-138, fns. omitted.) Notably, the *Stone* decision did not forbid continued use of these instructions. Rather, it noted some ambiguities in the wording of CALCRIM No. 600 and suggested ways to improve the instruction. (*Id*. at p. 138, fn. 3.) If the Supreme Court had intended to discourage or prohibit separate instruction on the kill zone theory, it would not have suggested improvements to CALCRIM No. 600.

Recently, *McCloud, supra,* 211 Cal.App.4th 788 cited *Bland* and *Stone* to support its conclusions that "jury instructions on the kill zone theory are *never* required" (*id.* at p.

802) and "[i]t is consequently *impossible* for a trial court to commit error, much less prejudicial error, by declining to give a kill zone instruction." (*Id.* at p. 803.)

We conclude from these authorities that the trial court is vested with discretion to include CALJIC No. 8.66.1 in the jury charge when it is supported by the evidence. To the extent it can be argued that CALJIC No. 8.66.1 is superfluous because the concept of concurrent intent is adequately explained in CALJIC No. 8.66 (see *McCloud, supra*, 211 Cal.App.4th at p. 803), any error resulting from inclusion of both instructions in the jury charge is harmless. The jury was instructed with CALJIC No. 17.31 which told them that some instructions might be unnecessary. Appellant's rights under the United States Constitution were not implicated by inclusion of a legally correct but superfluous instruction in the jury charge. No miscarriage of justice within the meaning of the California Constitution occurred. (*People v. Crew* (2003) 31 Cal.4th 822, 849 [superfluous instruction was harmless]; *People Wallace* (2008) 44 Cal.4th 1032, 1076 [same ].)

**4.    CALJIC No. 8.66.1 is not argumentative or biased**.

Next, appellant argues "CALJIC No. 8.66.1 is inappropriate because the term 'kill zone' is biased and prejudicial." He challenges the following sentences in this instruction: "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. [This zone of risk is termed the 'kill zone.']" (CALJIC No. 8.66.1.) Appellant argues the phrases "zone of risk" and "kill zone" "adds nothing to the legal point except to introduce argumentative terminology and improperly endorse a prosecutorial viewpoint." Recognizing that *Campos, supra,* 156 Cal.App.4th 1228 resolved this point adverse to his position, appellant argues *Campos* was wrongly decided and should not be followed. We are not convinced.

*Campos* determined that the term "kill zone" in CALCRIM No. 600 is neither argumentative nor inflammatory. It explained that "[a]n instruction is argumentative

31.

when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law" or when it invites "'"'"the jury to draw inferences favorable to one of the parties from specified items of evidence.' [Citations.]"'" [Citation.]" (*Id.* at p. 1244.) Then it reasoned:

> "CALCRIM No. 600 merely employs a term, 'kill zone,' which was coined by our Supreme Court in *Bland* and referred to in later California Supreme Court cases. [Citation.] It does not invite inferences favorable to either party and does not integrate facts of this case as an argument to the jury. Other disparaging terms, including 'flight' (CALJIC No. 2.52), 'suppress[ion] of evidence' (CALJIC No. 2.06) and 'consciousness of guilt' (CALJIC No. 2.03) have been used in approved, longstanding CALJIC instructions. We see nothing argumentative in this instruction." (*Campos, supra,* 156 Cal.App.4th at p. 1244.)

We agree with *Campos* that the phrase "kill zone" is not argumentative because it does not invite inferences that are favorable to either party and does not integrate facts of the case as an argument to the jury. The term "zone of risk" is not argumentative for the same reasons. While these terms are disparaging, they are not inflammatory and it is not reasonably possible that they would cause the jury to be biased against appellant.

*McCloud, supra,* 211 Cal.App.4th 788, was decided after completion of briefing in this case. In a footnote, it expressed the opinion that the language of CALJIC No. 8.66.1 "should probably be revised." (*Id*. at p. 802, fn. 7.) It reasoned:

> "… The instruction's repeated references to a 'zone of risk' are misleading and have no basis in the law—neither the phrase 'zone of risk' nor even the word 'risk' appears anywhere in *Bland*. The word 'risk' likewise appears nowhere in *Perez*, nowhere in the majority opinion in *Smith*, and nowhere in *Stone* apart from a quote of CALJIC No. 8.66.1. [Citation.] By referring repeatedly to a 'zone of risk,' the instruction suggests to the jury that a defendant can create a kill zone merely by subjecting individuals other than the primary target to a risk of fatal injury. As we have already explained, that is not correct." (*McCloud, supra,* 211 Cal.App.4th at p. 802, fn. 7.)

Although the point raised in *McCloud* is a different objection to the phrase "zone of risk" than was raised by appellant and this portion of the *McCloud* decision is dicta,

32.

we have decided to address the point. We do not believe that the phrase "zone of risk" is misleading. It does not impermissibly suggest to the jury that a defendant can create a kill zone merely by subjecting individuals other than the primary target to the risk of injury. Reasonable jurors would not interpret the phrase "zone of risk" as did the court in *McCloud*. The instruction must be considered in its entirety. When read as a whole, CALJIC No. 8.66.1 correctly explains the principle of concurrent intent.

### 5. Appellant was not prejudiced by use of CALJIC No. 8.66.1.

In any event, any possible error resulting from use of CALJIC No. 8.66.1 is harmless. Appellant assumes that the stringent prejudice standard that imposes a burden on the People of proving the error was harmless "beyond a reasonable doubt" applies. He is incorrect. "[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error, are reviewed under the harmless error standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836." (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1157.) Thus, *Campos* applied the *Watson* standard to a challenge to CALCRIM No. 600, finding that any possible error was not prejudicial. (*Campos, supra*, 156 Cal.App.4th at p. 1244.)

Considering all the circumstances, it is not reasonably probable that appellant would have obtained a more favorable result if the jury had not been instructed with CALJIC No. 8.66.1. The trial court properly instructed the jury on the elements of attempted murder with CALJIC No. 8.66. The appellate court presumes the jurors understood and followed the trial court's instructions. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005.) The kill theory was supported by substantial evidence. A person can be guilty of attempted murder even if he or she intended to kill a random person rather than a specific one. (*Stone, supra*, 46 Cal.4th at p. 141.) The jury could have concluded that appellant was guilty of attempting to murder Leon and Mosby under the kill zone theory. Appellant's statements to Dawson prove that he intended to kill everyone who walked in the Banks' backyard on September 21, 2006, while he was stealing marijuana.

33.

Similarly, his statements to Dawson about the shooting at the Cottonwood Apartments show that he intended to kill all the young men loitering in front of the apartment complex because he thought they were Country Boy Crips. This included Mosby, who was dressed in rival gang colors. The prosecutor's discussion on this theory was brief and not inflammatory. For all of these reasons, we conclude that appellant was not prejudiced by inclusion of CALJIC No. 8.66.1 in the jury charge. (*Campos, supra*, 156 Cal.App.4th at p. 1244.)

## III. Admission Of Evidence That Ellis Threatened Cannon Was Not An Abuse Of Discretion.

### A. Facts.

Pearlene Cannon testified that she did not recall hearing gunshots or seeing appellant holding a gun on the evening when Kerr was fatally shot. Cannon did not recall telling Ellis, that shortly after Kerr was shot she saw appellant running away while holding a gun. She did not recall if her sister, Lucille Parks, relayed to her threats Ellis made against her. Cannon did not recall talking to Bakersfield Police Officer Kyle Ursery. The prosecutor asked Cannon if she remembered telling Ursery that Parks told her that Ellis threatened her. Cannon answered, "No, I did not." Defense counsel said, "I have an objection. And I'd like an instruction this is not for the truth of the matter." The court asked if this testimony was "offered for state of mind?" The prosecutor replied, "This is offered for state of mind, credibility, and not for the truth of the matter." The court instructed the jury, "[I]f the witness testifies as to what someone else told her, her sister in this case, that what her sister told her is not being offered for the truth of the words that were spoken but it's to show this witness's state of mind. It's limited to that purpose. So you are going to consider it for that limited purpose only." Thereafter, Cannon testified that she did not recall if any law enforcement officer ever questioned her about the Kerr murder.

34.

After Cannon completed her testimony, the People called Ursery as a witness. Ursery testified that he spoke with Cannon on August 1, 2007. Cannon said that she had been threatened. The prosecutor asked Ursery to "tell us what she told you." Defense counsel objected on grounds of hearsay and "Crawford." An unreported sidebar conference was held. The court overruled these objections. It granted defense's request for these objections to be deemed continuing.

Ursery testified that Cannon told him that Parks had contacted her on July 31, 2007. Parks said that Ellis believed Cannon was responsible for appellant's arrest. Ellis reportedly said to Parks, "You tell Pearlene that if she comes over to the east side she's dead." Ellis also reportedly said to Parks, "If that bitch comes over to the east side I will have these young Eastsiders shoot her ass up." Cannon also told him that some people she did not recognize drove by her house in a white minivan. Ursery asked Cannon if she felt her life was in danger. She replied, "Hell, yeah, but I don't know why she is mad at me. I didn't see anything." Ursery testified that Cannon appeared fearful during their conversation.

Bakersfield Police Detective Royce Haislip was called as a prosecution witness. Haislip testified that he spoke with Cannon after reading Ursery's report about his conversation with her. Haislip and another detective spoke with Cannon at her home. Cannon "was very evasive" and would not "give any kind of direct answer as far as what she had seen" after Kerr's murder. Cannon expressed a great deal of fear for her safety and the safety of her family. Cannon said that she was going to move out of state because of this fear.

Detective Balasis testified that Cannon telephoned the police after Daniels was murdered. Balasis and another police officer met with Cannon at a park on July 2, 2009. Cannon said that she felt guilty because she had an opportunity two years ago to provide information about a shooting but had not done so and now the same person shot Daniels. Cannon said that on the night Kerr was shot she was walking in the area of the

35.

Cottonwood Apartments. She heard the sound of gunshots. A "very short time later" she saw appellant and two other males running in a southerly direction. Appellant was armed with a black gun that Cannon described as "an UZI or an AK." Cannon said that she called out, "Kerry." Appellant stopped and looked at her. The three men briefly stopped, looked at each other for a moment and then began running again. Cannon saw appellant enter a nearby apartment complex where he lived with his girlfriend. Cannon said that she told Ellis what she had seen on the night Kerr was killed. She began receiving threats from Ellis and other members of appellant's family.

Balasis recorded their conversation without Cannon's knowledge. An audio CD of the conversation and written transcription were entered into evidence (People's exhibits Nos. 54 & 54-A). Appellant's objections on the grounds of "[h]earsay and confrontation" were overruled. At defense counsel's request, the court instructed the jurors on tactics used during police interviews and speculative statements. The audio CD was played for the jurors, who were provided with copies of the transcription.

Thereafter, the court made the following findings:

> "I do want to make a record on the objection that you made when [the prosecutor] started offering testimony from the witnesses that followed Pearlene Cannon to impeach her with prior inconsistent statements. You objected on hearsay and Crawford. And I overruled your objection because the Court is making its finding now that Pearlene Cannon was not being truthful … when she told this Court that she could not remember the different things that she said to the various officers. And the Court found that she was evasive, and I base that finding both upon the words that she spoke as well as watching her body movements and mannerisms. So, that's the basis for my ruling."

Defense counsel stated that he wanted to put one more point on the record. He said:

> "I also made -- part of my objection included a request for instructions because much of the colloquy that we have heard between the officer, what the officer was saying, and Ms. Cannon -- if that was Ms. Cannon. She sounded different on the tape -- regarding statements that Mr. Hastings has

to be put away and that he was guilty, and stuff like that. And the Court did give an instruction implicitly overruling my objection I assume on [Evidence Code section] 352 grounds."

The court replied, "With regard to the evidence being probative and the prejudicial effect did not substantially outweigh it?" Defense counsel answered, "Yeah." The court responded, "That's my ruling."

## B. Evidence Code section 352 did not compel exclusion of the threat evidence.

Appellant contends the trial court abused its discretion by overruling his Evidence Code section 352 objection to admission of evidence that Ellis threatened Cannon. This argument is not convincing.

Initially, we address the question of forfeiture. To preserve a point for appellate review an objection must have been interposed at trial on that same ground. (Evid. Code, § 353; *People v. Kennedy* (2005) 36 Cal.4th 595, 612.) Appellant did not interpose an Evidence Code section 352 objection to the threat evidence on the record. He objected only on hearsay and confrontation grounds. Also, appellant did not did not argue that threat evidence should be excluded because the threat originated with a third party. He did not contend that the prosecutor presented the threat testimony under a pretext. Yet, the record is susceptible to the possibility that defense counsel could have interposed an Evidence Code section 352 objection during the unreported sidebar conference. After the court set forth its findings that Cannon was evasive and untruthful, appellant said, "And the Court did give an instruction implicitly overruling my objection I assume on [Evidence Code section] 352 grounds." The court replied, "With regard to the evidence being probative and the prejudicial effect did not substantially outweigh it?" Defense counsel answered, "Yeah," to which the court responded, "That's my ruling." We will treat this colloquy as sufficient to preserve an Evidence Code section 352 challenge for appellate review.

37.

Evidence Code section 352 permits exclusion of otherwise admissible evidence when the probative value of the evidence is outweighed by the risk of undue prejudice or excessive consumption of time. (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969.) "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '… The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) The trial court's exercise of discretion under Evidence Code section 352 will not be disturbed on appeal absent a clear abuse of discretion. (*Karis, supra,* at p. 637.)

Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact or consequence, including evidence relevant to the credibility of a witness. (Evid. Code, § 210.) "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court. [Citations.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 869 (*Burgener*).) "'[E]vidence of a "third party" threat may bear on the credibility of a witness, whether or not the threat is directly linked to the defendant.' [Citation.]" (*People v. Abel* (2012) 53 Cal.4th 891, 925.) "There is no requirement … that threats be corroborated before they may be admitted to reflect on the witness's credibility." (*Burgener, supra,* at p. 869.)

*Burgener* upheld admission of testimony about unattributed threats to explain a witness's fear, reasoning that "the threats explained why [the witness's] testimony in 1981 differed in certain respects from her current testimony." (*Burgener, supra*, 29 Cal.4th at p. 869.) *People v. Mendoza* (2011) 52 Cal.4th 1056, upheld admission of

evidence that the defendant's brother threatened a key prosecution witness and fellow gang members threatened two additional witnesses over defendant's Evidence Code section 352 objection. (*Mendoza, supra,* at pp. 1083-1088.)

We have examined the record in detail and conclude that Evidence Code section 352 did not require exclusion of the threat evidence. Cannon was an important witness because she saw appellant, armed with a firearm, running with two other men near the Cottonwood Apartments soon after Kerr was fatally shot. Evidence that appellant's mother threatened to kill her was probative to Cannon's state of mind and credibility. It explained why Cannon's testimony was inconsistent with her prior statements to police officers. The probative value of this evidence was not substantially outweighed by the risk of undue prejudice. The court dissipated any potential for unfair prejudice by granting appellant's request for a limiting instruction during Cannon's testimony.[15]

Appellant's contention that the threat evidence was unfairly prejudicial because the jurors were likely to have imputed the threats to him is not convincing. As previously explained, evidence that a witness fears retaliation is admissible to assess his or her credibility, even when the threat is not directly linked to the defendant. (*People v. Stewart* (2004) 33 Cal.4th 425, 492, fn. 28.) Appellant had the opportunity during cross-examination of Cannon and the police officers to elicit testimony clarifying whether or not appellant authorized his mother to threaten Cannon.

Relying on *Dudley v. Duckworth* (7th Cir. 1988) 854 F.2d 967, appellant also argues the prosecutor called Cannon as a witness merely as a pretext to admit the threat evidence. Federal court opinions are not binding on state courts as to interpretation of

---

[15] Appellant did not request a similar limiting instruction during the police officers' testimony concerning the threats Ellis made against Cannon. The trial court did not have a sua sponte obligation to give such an instruction. (*Mendoza, supra*, 52 Cal.4th at p. 1087, fn. 20.)

state law. (*McCann v. Lucky Money, Inc.* (2005) 129 Cal.App.4th 1382, 1396.) In any event, *Dudley* is factually and legally inapposite. In *Dudley*, the court found that the defendant's due process rights were infringed by admission of evidence concerning unspecified and unattributed threats that were made against witness Edward Pointer.[16] The threat evidence was admitted to explain Pointer's extreme nervousness. The reviewing court found there was no evidence that Pointer was unduly nervous about testifying. The fear was merely a pretext used by the prosecutor to gain admission of the threat evidence. (*Dudley, supra,* at pp. 970-972.) Contrary to appellant's argument, the appellate court did not find that the People called Pointer as a witness as a pretext to admit the threat evidence. It was Pointer's nonexistent fear that was pretextual.

In contrast with *Dudley*, there was ample evidence in this case demonstrating that Cannon was reluctant to testify and feared retaliation. The trial court made a finding that Cannon was evasive and untruthful when she testified that she could not remember things. The record supports this finding. Cannon was arrested and held in jail as a material witness so that her testimony could be presented to the grand jury. She testified at trial without a warrant but denied appearing of her own accord because she knew that she would be held in jail if she did not appear. Cannon was clearly scared to testify truthfully at trial. Thus, the impermissible pretext that occurred in *Dudley* is not present in this case.

Appellant's final complaint, that the trial court abused its discretion by failing to address in its ruling the specific points he advances on appeal, lacks merit. "'[T]he trial judge need not expressly weigh prejudice against probative value—or even expressly state that he has done so [citation].' [Citation.]" (*People v. Rowland* (1992) 4 Cal.4th

---

[16] Appellant did not object to admission of threat evidence on the ground that it infringed his federal due process right. Therefore, the point was not preserved for appellate review. (*Burgener, supra*, 29 Cal.4th at p. 869.)

238, 259, fn. 1; *Mendoza, supra*, 52 Cal.4th at p. 1087, fn. 20 ["court was not required to explicitly state it was engaging in the Evidence Code section 352 weighing process when it fashioned its order"].) Appellant did not argue below that threat evidence should be excluded because the threat originated with a third party or assert that the prosecutor presented Cannon's testimony under a pretext. Therefore, the trial court cannot be faulted for failing to specifically discuss those points in its ruling. The record shows that appellant applied the proper standard; nothing further is required.

## IV. Expert Gang Evidence Was Properly Admitted.

### A. Facts.

#### 1. In limine motions and evidentiary hearing.

Appellant filed an limine motion to bifurcate the trial of the gang allegations. He filed another in limine motion requesting pretrial review of gang-related evidence that the prosecution intended to introduce at trial.

The prosecutor opposed the motion to bifurcate trial of the gang allegations, arguing that gang evidence was "inextricably intertwined with all the underlying substantive offenses" and was relevant to prove motive, identity and specific intent.

An evidentiary hearing concerning the People's proposed gang evidence was held on December 15, 2010. (Evid. Code, § 402.) Stratton was the sole witness.

##### a. The PowerPoint.

Stratton testified that he prepared a PowerPoint presentation (PowerPoint) to accompany his testimony in this case.[17] The PowerPoint was shown during his testimony

---

[17] Exhibit No. 1 is a paper copy of the preliminary version of the PowerPoint that was played during Stratton's testimony at the evidentiary hearing. A paper copy of the final version of the PowerPoint that was played during Stratton's trial testimony was admitted as People's exhibit No. 172. During the evidentiary hearing the court ordered three slides to be removed from the PowerPoint. Therefore, the pagination of exhibit No. 1 is not the same as the pagination of exhibit No. 172.

at the evidentiary hearing and at trial. The PowerPoint begins with slides summarizing the history of the Crips gang in Bakersfield. Then it contains slides about the Eastside Crips; their geographical boundaries, identifying tattoos, hand signs, colors and primary activities. The same information is then provided about the Westside Crips and the Country Boy Crips. Next, the PowerPoint contains slides providing information about five predicate offenses committed by Eastside Crips gang members.

Next, the PowerPoint contains slides containing information about appellant. There is a slide containing a photograph of appellant with information about his gang affiliation, moniker and tattoos. This is followed by slides containing photographs of appellant's tattoos. Next are slides providing information about appellant's contacts with police officers during the period of August 12, 1999 to June 22, 2009. This is followed by two slides setting forth information concerning field interviews police officers conducted with appellant during 2001. The next slide lists each date that appellant was booked during the period of February 22, 2004 to July 11, 2009, and indicates whether or not appellant admitted being affiliated with a gang on that date.

The PowerPoint concludes with slides containing information about individuals other than appellant who are connected in some way to the criminal incidents that resulted in the charges that were filed against appellant. Each slide pertains to a different person. The person's name, photograph, tattoos, moniker, gang affiliation, contacts and booking dates are set forth (as applicable). These slides are subdivided into seven groups based on the location and date of the criminal incident. There is a title page for each subdivision.[18]

---

[18] The title pages are: "Mr. Fast Gas 3/06/04," "Fairview Drive 9/20/06," "Fairview Drive 9/21/06," "Cottonwood Rd 7/24/07," "… Northrup St 5/12/09," "Reese Ave 6/30/09" and "Howard Johnson 7/11/09." Following the Mr. Fast Gas title page are slides containing information about Carl Jones, Deon Davis and Columbus Holford. Following the Fairview Drive title pages are slides containing information about Leonard,

### b. Stratton's testimony at the evidentiary hearing

Stratton testified about five predicate offenses committed by members of the East Side Crips gang. Appellant asked the court to "excise some of the predicates," pursuant to Evidence Code section 352. The court overruled this objection, finding that each offense was probative and not inflammatory. It found the dates of the predicate offenses properly took into consideration the dates of the charged crimes.

Stratton testified about reports involving appellant that were generated by law enforcement agencies during the period of 1999 to 2009. These reports include street checks, field interview cards, booking records and offense reports. PowerPoint slides summarized the facts of each case and circumstances of each contact. Appellant objected to testimony about these reports and the associated PowerPoint slides "on Crawford issues, lack of confrontation and lack of personal knowledge on the part of the officer in what he is recounting. I know there's a California case holding against me. But I want to preserve these issues, and I am grounding my objection in Federal concerns." The prosecutor opposed this motion, citing *People v. Thomas* (2005) 130 Cal.App.4th 1202. The court overruled these objections.

Appellant objected to Stratton's testimony about people other than appellant who were connected to the charged crimes and to PowerPoint slides containing information about such individuals. Appellant argued that "to associate these people with the events

---

Leon, Julia Johnson, Mitchell, Jessie Hill, Jeremy Johnson, Donald Parrish, Diante Nettles, Mark Tatum and Markisha Williams. Following the Cottonwood Road title page are slides containing information about Kerr, Mosby, Rodney Johnson, Clarence West, Anthony Hodge, Eugene Cooks and Shanika Herron. Following the Northrup Street title page is a slide containing information about Ebony Nichols. Following the Reese Avenue title page are slides containing information about Daniels, Mitchell, Bobby Moore, Regan Roberts, Irahan Avila and John Henry Bryant. Following the Howard Johnson title page are slides containing information about Maurice Barnett and Jason Dawson.

by somebody who is not a percipient witness to those events is a form of argument" that is proscribed by *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*).

The prosecutor replied that during Stratton's trial testimony he would only ask if Stratton "has researched that person and what is his opinion on that person. I wouldn't be asking him is that individual connected with a certain event."

Defense counsel replied:

> "My objection is that it's argumentative in that if you put up a slide with a certain incident and then the next thing is a couple of people or certain people and you ask about them, it doesn't matter how you frame the question. The fact that the referenced incident is followed by those people basically assumes and tells the jury that the prosecution theory of the case is true as to who is involved in each incident and that the expert's relying upon that. Basically, it's a subtle way of associating people with incidents outside of the proper forum, which is argument."

The court overruled this objection. It also declined to exclude these slides pursuant to Evidence Code section 352, finding they were not unduly argumentative or prejudicial. It found that the title slides merely served to identify the subject matter that will follow them.

Appellant interposed an Evidence Code section 352 objection to the photograph of a Bakersfield police department badge that is depicted on the first slide of the PowerPoint. The court overruled this objection, finding that the depiction of the badge was not unduly prejudicial.

The court ordered a slide about the Eastside Crips "to delete the reference to Penal Code Section 186 and the reference to qualifying them as a criminal street gang."

Appellant objected on Evidence Code section 352 grounds to three video clips that were identified as slide Nos. 18, 27 and 29 in exhibit No. 1. This objection was sustained.

The court denied appellant's motion to bifurcate trial of gang issues. It found "that evidence of gang affiliation is relevant to the issues of one or more of the following:

44.

motive, intent, identity, malice, and premeditation, as to each of the charges." It found that the prejudicial effect of the gang evidence did not substantially outweigh its probative value.

The court asked defense counsel if it had ruled on all of appellant's objections. Defense counsel answered in the affirmative and said there was nothing else he specifically wanted the court to rule on in connection with Stratton's testimony.

The court stated that it had conducted a discussion with counsel in chambers concerning the in limine motions. The contents of this discussion were not memorialized on the record.

### 2. Stratton's trial testimony.

Stratton testified about the history and culture of criminal street gangs in Bakersfield, including the Eastside Crips, the Westside Crips and the Country Boy Crips. The Eastside Crips are rivals of the Country Boy Crips and the Westside Crips from 2004 to 2009. The rivalry was particularly violent between 2006 and 2009.

Stratton testified that the Eastside Crips have over 400 members. This gang has claimed specific areas of Bakersfield for the past 20 years. They identify with the colors royal blue and navy blue. They have identifying hand signs and tattoos. Their primary criminal activities are possession of firearms and other weapons, assaults with firearms and other deadly weapons, robberies, auto thefts, carjackings, burglaries and narcotics sales. Stratton testified about five predicate offenses committed by Eastside Crips members during the period of 2001 to 2007. A certified copy of the "registrar of action" for each crime was admitted into evidence.

The prosecutor asked if Stratton believed appellant was a member of a criminal street gang. Defense counsel objected on the ground of "[i]mproper question." An unreported sidebar conference was held. The court overruled the objection and gave the following limiting instruction:

45.

"The witness may testify as to certain matters that he describes as facts or evidence and then form opinions based upon what he's describing as the facts that he is aware of.

"I am instructing you that if the witness is relying upon things that are not within his personal knowledge, that anything that he relies upon that's not within his own personal knowledge, is not being offered for the truth of what he is talking about but it's limited to allow him to form an opinion as to that information.

"So I am admonishing you that just because he describes certain information that he's gathered that he believes relates somehow to this defendant, that's not necessarily--that's not to be considered by you as true. Rather, you are to consider that in evaluating his opinion and decide--I will be giving you instructions as to how you evaluate expert witness's opinions. And you can consider how much weight you are going to give to his opinion as you evaluate whether or not there's really an adequate basis for his opinion."

Thereafter, defense counsel stated that it should have "laid that out more fully earlier" but the earlier objection was "also based on hearsay and confrontation." The court overruled these objections, which it deemed continuing.

Stratton testified that appellant has been an active member of the Eastside Crips for over 10 years. He was an active gang participant at the time each of the charged crimes were committed. Appellant's gang moniker was "K9." Appellant has tattoos with gang significance. Stratton testified that in forming this opinion he relied upon reports involving appellant generated by law enforcement agencies during the period of 1999 to 2009. These included street checks, field interview cards, booking records and offense reports. Stratton testified that he personally had sporadic contact with appellant for the past four or five years. Stratton spoke with the investigating officers who were involved in some of appellant's contacts with law enforcement.

Stratton opined whether or not various individuals connected with the charged crimes were gang members.[19]  Stratton testified, based on hypothetical situations, that each of the charged crimes was committed in association with and for the benefit of the Eastside Crips and with the intent to promote, further or assist in criminal conduct by gang members.

During Stratton's testimony the PowerPoint was played for the jury.  When the People moved to admit the paper copy of the PowerPoint into evidence defense counsel stated that he would stipulate it could be used to make a record as to what was being displayed to the jury.  Yet, he was preserving all prior objections.  Defense counsel subsequently objected to exhibit No. 172 being allowed into the jury room during its deliberations.  Defense counsel argued it "is not actual evidence. It is a summary of other evidence, the testimony of the witness."  The prosecutor responded that exhibit No. 172 was not prejudicial and was an "aid to the expert's testimony.  And the majority of it were items that I think we could have presented independently."  The court stated, "I think it would have to be removed from evidence if I grant [defense counsel's] request."  It ruled that exhibit No. 172 "shall remain in evidence, shall be available to the jury."

### B.  Stratton's reliance on testimonial hearsay in forming his opinions did not infringe appellant's confrontation right.

Appellant asserts that Stratton's opinion testimony was based in "large part" on "testimonial hearsay from mostly unnamed declarants."  He argues that admission of this

---

**19** Stratton opined that Daniels, Mitchell, Carl Jones, Deon Davis, Columbus Holford, Jesse Hill, Donald Parrish, Diante Nettles, Markisha Williams, Shanetta Brooks, Anthony Hodge, Eugene Cooks, Bobby Moore, Regan Roberts, Irahan Avila, John Henry Bryant, Neil Davidson, Edward Campbell, Eddie Earl Howard, Kelan Williams, Craig Hunter, Lloyd Killebrew, Michael Hanks, Danny Cannon, Billy Ray Thompson, Maurice Barnett, and Jason Dawson are gang members or were gang members at the time of their deaths.  Jeremy Johnson, Ryan Johnson, Shanika Herron, and Ebony Nichols could be considered gang associates.  Leon, Kerr, Mosby, Rodney Johnson, and Clarence West are not gang members or were not at the time of their deaths.

evidence violated his Sixth Amendment confrontation right as interpreted in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).  We disagree.

Under *Crawford, supra*, 541 U.S. 36 and *Davis v. Washington* (2006) 547 U.S. 813, admission of a testimonial out-of-court statement is barred by the confrontation clause of the Sixth Amendment unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.  Several California appellate courts have concluded that there is nothing in *Crawford* or *Davis* that prohibits a gang expert from relying on hearsay as a basis for his or her opinions that identify a person as a gang member or about gang behavior generally.  (See, e.g., *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427; *People v. Fulcher* (2006) 136 Cal.App.4th 41, 57; *People v. Thomas, supra,* 130 Cal.App.4th at p. 1210.)   We discern no basis to depart from these authorities.

"Expert testimony may … be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions."  (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.)  This may include reliable hearsay.  (*Ibid*.)  A expert witness may describe the material that forms the basis of the opinion, including material that is not directly admissible.  (*People v. Thomas, supra*, 130 Cal.App.4th at p. 1209.)

"Hearsay in support of expert opinion is simply not the sort of testimonial hearsay the use of which *Crawford* condemned."  (*People v. Ramirez, supra*, 153 Cal.App.4th at p. 1427.)  "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions.  This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion.  *Crawford* itself states that the confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing

48.

the truth of the matter asserted.' [Citations.]" (*People v. Thomas, supra*, 130 Cal.App.4th at p. 1210.)

Courts have previously found the type of material Stratton based his opinions on to be reliable. Gang experts regularly use materials they receive from law enforcement personnel and probation officers such as police reports and field identification cards. (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, fn. 9.) Experts may rely upon personal contacts with past and present members of gangs. (*People v. Ruiz* (1998) 62 Cal.App.4th 234, 241.) They may rely on photographs of the defendant and on his writings. (*People v. Gamez* (1991) 235 Cal.App.3d 957, 967.)

Appellant's assertion that the hearsay materials on which Stratton relied were offered for the truth of the matters asserted therein lacks basis in fact. The jury was instructed that anything Stratton "relies upon that's not within his own personal knowledge, is not being offered for the truth of what he is talking about but it's limited to allow him to form an opinion as to that information." This instruction adequately informed the jury of the evidentiary limitations of the challenged testimony.

Appellant's citation to the recent decision of the United States Supreme Court in *Williams v. Illinois* (2012) ___ U.S. ___ (132 S.Ct. 2221) does not advance his argument. In *Williams*, the plurality opinion of four justices found that information contained in a DNA report was not testimonial. The DNA report was only admitted to explain the basis of the police forensic biologist's independent conclusion and it was not prepared for the primary purpose of a criminal prosecution.

For these reasons we conclude that admission of Stratton's testimony concerning the hearsay bases for his expert gang opinions did not infringe appellant's Sixth Amendment confrontation right.

### C.     No *Killebrew* violation occurred.

As previously explained, the portion of the PowerPoint containing information about individuals other than appellant is subdivided into seven sections. Each

subdivision is preceded by a title slide that lists a specific date and location where a criminal event occurred. Relying on *Killebrew, supra*, 103 Cal.App.4th 644, appellant argues that the inclusion of these title pages constitutes improper expert opinion that these individuals participated in the criminal events. This argument is not convincing.

"It has long been settled that expert testimony regarding whether a crime was gang related is admissible." (*People v. Vang* (2011) 52 Cal.4th 1038, 1050, fn. 5 (*Vang*).) *Killebrew, supra,* 103 Cal.App.4th 644 prohibited experts from testifying "whether the *specific* defendants acted for a gang reason." (*Vang, supra,* 52 Cal.4th at p. 1048, fn. omitted.)[20]

We reject appellant's claim of *Killebrew* error because his interpretation of the PowerPoint is not reasonable. Stratton did not testify that specific people were involved in the criminal events with appellant. The jurors would not reasonably have understood the title pages as constituting such testimony. The title pages merely served to generally identify the subject matter that followed them.

In any event, it is not reasonably possible that the inclusion of the title pages in the PowerPoint affected the verdict. Ordinarily, "violations of state evidentiary rules do not rise to the level of federal constitutional error." (*People v. Benavides* (2005) 35 Cal.4th 69, 91.) The *Watson* prejudice standard applies. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611; *People v. Watson, supra,* 46 Cal.2d 818, 836.) Appellant's assertion that the jury's consideration of the gang allegations and conspiracy charge was tainted by the title pages is not convincing. Properly admitted evidence such as Dawson's testimony connected various individuals in addition to appellant to the charged crimes. Also, there is overwhelming evidence of appellant's guilt of the charged crimes and of their gang-

---

[20] *Vang* disapproved *Killebrew* to the extent that it purported to condemn the use of hypothetical questions that were based on the evidence in the case. (*Vang, supra*, 52 Cal.4th at p. 1047, fn. 3.)

relatedness.  There is no risk that appellant was found guilty because of his association with individuals who are referenced in the PowerPoint.  It is not reasonably probable that the jury would have returned a verdict more favorable to appellant if the title pages had been excluded from the PowerPoint.  (*Vang, supra*, 52 Cal.4th at p. 1052, conc. opn. of Werdegar, J. [found claimed *Killebrew* error to be harmless].)

**D.      Evidence Code section 352 did not require exclusion of the PowerPoint.**

Appellant argues that allowing the PowerPoint to be played during Stratton's testimony and admitting exhibit No. 172 into evidence was an abuse of discretion under Evidence Code section 352.  We disagree.

Once again, we must begin by addressing the question of forfeiture.  During Stratton's testimony defense counsel stated that during the evidentiary hearing he had "objected to the PowerPoint in its entirety under [Evidence Code section] 352 grounds as to the nature of the presentation."  The record does not support defense counsel's statement.  Although defense counsel objected to various portions of the PowerPoint on Evidence Code section 352 grounds during the evidentiary hearing, he did not object to the entirety of the PowerPoint on this basis.  He did not argue that Stratton should be prohibited, under Evidence Code section 352, from using a PowerPoint during his testimony or that the printed copy of it should be excluded from evidence.   Nonetheless, we will assume, without deciding, that defense counsel's comment during trial was sufficient to preserve the issue for appellate review.

The trial court has broad discretion in determining the relevance of evidence.  (*People v. Weaver* (2001) 26 Cal.4th 876, 933.)  It may exclude relevant evidence under Evidence Code section 352 if its probative value is substantially outweighed by the risk of undue prejudice or excessive consumption of time.  (*People v. Wesson, supra,* 138 Cal.App.4th at p. 969.)  The trial court's exercise of discretion in determining the admissibility of evidence under Evidence Code section 352 will not be reversed unless

the ruling is arbitrary, capricious or patently absurd. (*People v. Ochoa* (2001) 26 Cal.4th 398, 437-438.)

There was no abuse of discretion in the present case. The PowerPoint is the functional equivalent of a written report prepared by a testifying expert. The information contained in the PowerPoint was relevant, admissible and not unfairly prejudicial. It contains information on which Stratton based his opinions that appellant was a gang member, the charged crimes were gang related and the predicate offenses were gang related. Some of the information contained in the PowerPoint was duplicative of other testimony. For example, Dawson identified Mitchell and other individuals who are referenced in the PowerPoint as gang members. Dawson testified about appellant's statements concerning the participation of such individuals in the charged offenses.

Appellant's argument that the presence of exhibit No. 172 in the jury room further "compounded the prejudice" is not persuasive. Appellant did not cite any authority supporting the proposition that the court possesses discretion to prohibit the jury from examining a properly admitted trial exhibit during its deliberations. Appellant's analogy comparing the PowerPoint to a writing that is used to establish a past recorded recollection fails because that type of writing may not be admitted as an exhibit by its proponent. (See *People v. Stevenson* (1978) 79 Cal.App.3d 976, 990.) In contrast to a past recorded recollection, the PowerPoint was admitted as a trial exhibit.

In any event, the alleged error is harmless. As previously explained, the applicable prejudice standard is the *Watson* standard. (*People v. Cudjo, supra*, 6 Cal.4th at p. 611.) Considering all the circumstances, we are confident that the PowerPoint did not affect the verdict. The evidence of appellant's guilt of the charged offenses, of his gang membership and of the gang relatedness of the crimes was overwhelming. Appellant did not present any defense witnesses. There is no reasonable probability that the jury would have returned a more favorable verdict if Stratton had not shown the PowerPoint during his testimony or if exhibit No. 172 had been excluded from evidence.

**V.      Prosecution Of Count 10 Was Time Barred.**

   **A.      Facts.**

   Grand jury proceedings began in this case on November 2, 2009.  The grand jurors were provided with an indictment.  During proceedings the prosecutor presented the jurors with a first amended indictment that superseded the original indictment.  The first amended indictment made several substantive changes.  Shortly thereafter, the prosecutor presented the jurors with a second amended indictment that corrected some typographical errors.

   On November 17, 2009, the grand jury returned a true bill on all counts, the second amended indictment was filed and an arrest warrant was issued.

   Counts 7 through 10 of the second amended indictment relate to events that occurred on September 20, 2006.  Appellant was charged in count 7 with attempting to murder Leon, in count 8 with assaulting Leon with a firearm, and in count 9 with robbing Leon.  Count 10 charged appellant with being a felon in possession of a firearm.

   Counts 11 through 14 relate to events that occurred on September 21, 2006.  Appellant was charged in count 11 with murdering Leonard and in count 12 with attempting to murder Leon.  Count 13 charged appellant with being a felon in possession of a firearm.  Count 14 charged appellant with robbing Leon.

   On December 16, 2009, the prosecutor motioned to dismiss counts 9, 13 and 14 because the statute of limitations had expired on these crimes.  The court found good cause and dismissed these counts.  Neither the prosecutor nor defense counsel mentioned count 10.

   The court sentenced appellant on count 10 to eight months (one-third the middle term) plus 16 months for the section 186.22, subdivision (b)(1) enhancement.  Count 10 was ordered to be served consecutive to count 26.

**B.** **Prosecution of count 10 commenced after expiration of the three-year statute of limitations.**

"[T]he statute [of limitations] is jurisdictional, and … an indictment or information that shows on its face that the prosecution is barred by limitations fails to state a public offense. The point may therefore be raised at any time, before or after judgment." (*People v. McGee* (1934) 1 Cal.2d 611, 613.) "[A] defendant may not inadvertently forfeit the statue of limitations and be convicted of a time-barred charged offense…. [I]f the charging document indicates on its face that the charge is untimely, absent an express waiver, a defendant convicted of that charge may raise the statute of limitations at any time." (*People v. Williams* (1999) 21 Cal.4th 335, 338.) "[T]he government cannot overcome the bar of a statute of limitations by demonstrating a lack of prejudice to the defendant." (*People v. Zamora* (1976) 18 Cal.3d 538, 547.)

The crime of illegal firearm possession by a felon in violation of former section 12021, subdivision (a)(1) is subject to a three-year statute of limitations. (§ 801, former § 12021, subd. (c)(1).) Count 10 was committed on September 20, 2006. The grand jury proceedings began on November 2, 2009, and the second amended indictment was filed 15 days later. Thus, prosecution of count 10 commenced more than three years after the date on which the crime occurred.

Respondent argues that that it is not clear whether prosecution of count 10 was time barred "because there may have been a first amended indictment or an original indictment that was filed on or before September 20, 2009." The reporter's transcript of the grand jury proceedings solves the mystery of the missing indictments. At the beginning of the grand jury proceedings on November 2, 2009, the jurors were provided with an indictment. The prosecutor subsequently presented the grand jurors with a first amended indictment that superseded the original indictment. The first amended indictment made several substantive changes. Shortly thereafter, the prosecutor presented a second amended indictment to the grand jury that corrected some

typographical errors.  Thus, the appellate record is adequate to resolve this issue and we reject respondent's request to remand the matter to the trial court for the limited purpose of "clearing up the ambiguity."

Since the appellate record establishes that prosecution of count 10 commenced more than three years after the offense was committed, the conviction is invalid and void. (*People v. Zamora, supra*, 18 Cal.3d. at p. 547.)  The effect of reversing count 10 on appellant's sentence presents a pure question of law with only one answer.  Therefore, it is appropriate to resolve the point on appeal and order any necessary sentencing modifications rather than to remand the matter to the trial court for this limited purpose. (See *People v. Smith* (2001) 24 Cal.4th 849, 852-854.)  On count 10, the court imposed a subordinate term of eight months (one-third the midterm) plus 16 months for the section 186.22, subdivision (b)(1) enhancement.  We will vacate this punishment.  This modification does not have any effect on the remainder of appellant's sentence.

## VI.     Clerical Error In The Abstract Of Judgment.

Rendition of judgment is an oral pronouncement.  (*People v. Mesa* (1975) 14 Cal.3d 466, 471.)  The abstract of judgment "'cannot add to or modify the judgment which it purports to digest or summarize.' [Citation.]" (*Ibid*.)  When there is a discrepancy between the oral pronouncement of judgment and the abstract of judgment, the oral pronouncement controls.  (*Ibid*.)

The trial court imposed the upper term of five years for count 26.  Respondent asserts that the abstract of judgment incorrectly describes this term as the low term.  Our review of the abstract of judgment reveals that this term was incorrectly described as the middle term.  Since the abstract of judgment does not accurately reflect the judgment as orally pronounced, we will direct the trial court to prepare an amended abstract of judgment.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

Respondent also asserts than the abstract of judgment erroneously failed to reflect that the court stayed the two-year term that was imposed for the out-on-bail enhancement

attached to count 22. The sentencing record does not support this assertion. The court did not stay the two-year term that was imposed for the out-on-bail enhancement attached to count 22. The court stated during sentencing, "As the enhancement per Penal Code Section 12022.1 may only be imposed once per case, it will be stricken on counts 23, 24, and 26. *It will be imposed on Count 22.*" (Italics added.)

## DISPOSITION

The conviction on count 10 is reversed and the sentence imposed for count 10 is vacated. The superior court is directed to prepare an amended abstract of judgment reflecting all of the following: (1) reversal of count 10; (2) that the punishment imposed on count 10 has been vacated; and (3) the five-year term imposed for count 26 is the upper term. The superior court is also directed to transmit copies of the amended abstract of judgment to the parties and the appropriate authorities. As so modified, the judgment is affirmed.

_____
LEVY, Acting P.J.

WE CONCUR:


_____
KANE, J.


_____
FRANSON, J.

56.